**DISSENT and CONCUR; Opinion Filed November 21, 2022**



In The
### Court of Appeals
### Fifth District of Texas at Dallas

**No. 05-22-00456-CV**

**IN THE INTEREST OF K.D.S.P., CHILD**

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-20-00042**

## CONCURRING AND DISSENTING OPINION

Before Justices Schenck, Pedersen, III, and Smith
Opinion by Justice Schenck

Parental termination cases necessarily involve constitutional rights. *See In re In re C.J.C.*, 603 S.W.3d 804, 811 (Tex. 2020) (citing *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality op.)). This case is no exception. It is because of these rights that indigent parents have a right to be represented by counsel in proceedings initiated by the State in both the trial court and on appeal. *See* TEX. FAM. CODE §§ 107.013, 107.016(2); *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (holding right to counsel under section 107.013 through exhaustion of appeals under section 107.016(2)(B) includes all proceedings in the supreme court). We have also recognized that in parental termination cases, the parents, just as defendants in criminal cases are entitled to effective assistance of counsel. *See In re M.S.*, 115

S.W.3d 534, 545, 550 (Tex. 2003) (holding parents have right to effective assistance of counsel in cases involving termination of parental rights and directing use of criminal standard) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Because of these important rights, in my view, where the counsel provided to parents to protect their fundamental rights fails to provide effective assistance of counsel, I would conclude that we may consider whether that deficient performance affected the outcome of the case, especially where that deficient performance affects our ability to review the trial proceedings for the basic assurance that disruptions of parental rights are based on the law and proof required under it.

After reviewing the record on appeal, at least in the instance of Father's appeal, but for the deficient performance, I would conclude the result on appeal would have been contrary to the judgment entered against him on the issue of conservatorship, as there is no evidence to support the implied finding that appointment of him as managing conservator would significantly impair K.D.S.P.'s physical health or emotional development. I would then reach and sustain the sufficiency issue he raised.

Accordingly, I concur in the majority's decision to affirm the portion of the trial court's order terminating the parental rights of Mother as to K.D.S.P., but I dissent to affirming the remainder. Instead, I would reverse the remainder of the trial court's order, render judgment that Father be appointed sole managing conservator of K.D.S.P., and remand the case to the trial court for further

consideration of whether Foster Parents should be granted possessory conservatorship of K.D.S.P. Because the majority does not reach Father's sufficiency issues and because the majority instead affirms the trial court's order as to Father and Foster Parents, I dissent.[1]

## BACKGROUND[2]

Father moved from Reynosa, Mexico, to Dallas, Texas, in 2017. Father regularly called home to stay in touch with his wife and sons, as well as sent home

---

[1] In addition to my concurrence in part and dissent in part to the judgment, I include this footnote to express my objection to the reconstitution of this panel after the decision in this case. Our rules oblige the court to determine at the outset whether a case will be decided by a panel or the en banc court and where two or more justices "agree on the judgment[,]" the "panel opinion constitutes the court's opinion, and the court must render judgment in accordance with the panel opinion." *See* TEX. R. APP. P. 41.1; *id.* 47.2 (requiring names of participating justices be noted on all written opinions or orders of court or panel of court). After an opinion has circulated in an argued case, no other justice must join it, but at least two must concur in the judgment. *Id.* 41.1. It is ***only*** where a panel member cannot "participate" in the decision may a substitution take place. *Id.*

Justice Osborne approved of the opinion and the judgment it dictates prior to her resignation, as did another justice. She therefore participated. As the Clerk, not the justices, communicates the Court's opinion to the parties, there was in fact no further "participation" permitted, apart from the unrealized potential for her to withdraw her assent to the judgment. Nevertheless, after Justice Osborne's departure, a majority of the Court voted to substitute other sitting justices or visiting justices on any case on which Justice Osborne was originally assigned to the panel—regardless of whether she had participated or communicated her approval of the judgment to the Clerk prior to her resignation. In this case, the substitution, while improper in my view, does not alter the judgment and is disclosed to the parties.

I have previously and broadly expressed my view that this Court's practices concerning the assignment and decision of cases do not comport with my understanding of the rules of procedure or the due process rights of litigants to a decision derived by random processes. *See, e.g.*, *Steward Health Care Sys. LLC v. Saidara*, 633 S.W.3d 120, 153–154, 164 (Tex. App.—Dallas 2021, no pet.) (interpreting rule 41.1 to provide that once two or more justices have agreed on judgment, case is "decided" and objecting to substitution of new justice after original panel member participated in opinion and judgment not released before expiration of original panel member's term of office).

[2] I do not fault the recitation of the facts in the majority opinion, but because I would conclude that the evidence in this record would support a different outcome, I provide the background facts necessary for context in this opinion.

–3–

money each week.  That year, Father also met Mother, and by 2018, Father and Mother had entered into a romantic relationship.

Mother has been addicted to drugs since she was fourteen years old.  Prior to meeting Father, she used heroin while pregnant with her two children from a previous relationship, and both children were born addicted to heroin.  Both children were removed due to that addiction and placed with paternal relatives.

At his construction job, Father was offered and began using illegal drugs to keep up with the work.  Father and Mother continued to use illegal drugs until Mother learned she was pregnant around September of 2019.  Both parents agreed to seek treatment, and Mother went to a methadone clinic.  Both soon relapsed, but each hid his or her drug use from the other.

In December of 2019, K.D.S.P. was born two months prematurely and addicted to heroin.  The hospital reported the child's addiction at birth to the Department.  A few days after her birth, the Department filed a petition for protection, conservatorship, and termination.  Both parents submitted to drug testing at the Department's request.  Mother and Father tested positive for illegal drugs.  The Department took custody of K.D.S.P. and subsequently placed her with Foster Parents.

Mother visited K.D.S.P. in the hospital, but she failed to appear at a hearing two weeks after K.D.S.P.'s birth.  The Department served her by publication.

Mother also failed to appear at a supervised visit scheduled at the beginning of February 2020. Mother did not file an answer until June 17, 2021.

In January 2020, Father returned to Reynosa to enter drug–rehabilitation treatment. Upon his release from treatment, Father worked with the Department's office in McAllen and the Mexican equivalent of the Department, DIF, to complete the services. While K.D.S.P. remained in the care of Foster Parents, Mother did not visit her, despite the fact that remote visits were offered to her. However, in June of 2020, Father began visiting K.D.S.P. via video calls and consistently visited her throughout the pendency of this case.

In October of 2020, the Department received a home study report from DIF on Father and Stepmother, but the Department sent it to be translated from Spanish to English.

On January 13, 2021, Father filed his original answer, requesting a jury trial and seeking return of K.D.S.P. to him, as well as lesser alternative forms of relief, such as joint managing conservatorship and possessory conservatorship. During the pendency of the case, Father requested and obtained continuances in order to translate from Spanish to English the home study conducted by DIF and to allow additional information requested by the Department to be gathered.

On August 30, 2021, Foster Parents filed a petition to intervene in the Department's suit, seeking the termination of both Mother's and Father's parental rights as to K.D.S.P. Foster parents requested the Department be appointed

managing conservator and alternatively that they be appointed joint managing conservators. The Department declined to pursue termination of Father's rights at trial. And, as detailed below, a jury refused to terminate his rights.

The case proceeded to trial before a jury, at which Mother, Father, Foster Parents, and other witnesses testified. At the conclusion of the trial, the jury returned a verdict, finding, among other things, it was in the best interest of K.D.S.P. for Mother's parental rights to terminated,[3] for Father's parental rights to not be terminated,[4] for Foster Parents to be appointed joint managing conservators, and for Father to be appointed possessory conservator. The trial court signed an order terminating Mother's parental rights and appointing Foster Parents permanent joint managing conservators and Father possessory managing conservator consistent with the jury's findings. That order also required Father's possession be supervised and included a finding that unsupervised access would endanger the physical health or safety of K.D.S.P.

Mother and Father filed separate notices of appeal and briefs in this case.

---

[3] The jury also found Mother had allowed K.D.S.P. to be placed or remain in conditions or surroundings that endangered the child's physical or emotional well-being, had engaged in conduct or placed K.D.S.P. with persons who engaged in conduct that endangered the child's physical or emotional well-being, and constructively abandoned K.D.S.P.

[4] The jury found Father had allowed K.D.S.P. to be placed or remain in conditions or surroundings that endangered the child's physical or emotional well-being and had engaged in conduct or placed K.D.S.P. with persons who engaged in conduct that endangered the child's physical or emotional well-being. Despite those findings, the jury concluded termination of his parental rights as to K.D.S.P. would not be in the child's best interest.

## DISCUSSION

## I.   Important Procedural Concerns

As noted by the majority, no party, other than appellants, has filed a brief in this case, and I fully agree with the majority's decision that we may, if not must, raise the question of whether the parties have preserved their issues on appeal. Additionally, I agree that the record before us on appeal contains no action taken on the part of the parents' appointed counsel to preserve their sufficiency issues on appeal. Where I disagree is whether our analysis should stop there. I believe it should not.

While considering this appeal, I questioned whether appellants' sufficiency issues had been preserved in the record on appeal and sought to request and permit the parties to submit supplemental briefing to respond to that question and to address whether appellants received effective assistance of counsel. *See* TEX. R. APP. P. 38.9(b) 44.3. The panel declined to permit further briefing to address those issues. I dissent from that decision.

I further dissent from the panel's decision not to examine on our own motion whether appellants have been provided by the State constitutionally and statutorily required guaranteed effective assistance of counsel in this an action initially filed by the State seeking to terminate appellants' parental rights. *See* TEX. FAM. CODE §§ 107.013, 107.016(2); *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (holding right to counsel under section 107.013 through exhaustion of appeals under section

107.016(2)(B) includes all proceedings in the supreme court). In my view, the State acted to terminate constitutionally guaranteed and fundamental rights and then failed to ensure the protection of those same rights guaranteed by the constitution and statutes. I would conclude the procedural facts and record in this case would permit us to review unpreserved error. *See In re B.L.D.*, 113 S.W.3d 340, 352 (Tex. 2003) ("our procedural rules bar review of unpreserved error *except in very narrow circumstances*") (emphasis added).

In *In re B.L.D.*, the supreme court engaged in an analysis of whether review of an unpreserved issue regarding a jury charge in a parental termination case was required by due process. *See id.* In that case, the supreme court began with the presumption that the rules governing preservation of error in civil cases comport with due process. *See id.* (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981). The supreme court then applied the three factors set forth by *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976): (1) the private interest affected by the proceeding or official action; (2) the countervailing governmental interest supporting use of the challenged proceeding; and (3) the risk of an erroneous deprivation of that interest due to the procedures used. *See id.* After concluding the private interests of the parents weighed in favor of reviewing unpreserved error and that the State's interests weighed against, the court assessed the risk that the application of the preservation rules to bar review of unpreserved complaints would cause the parents to be erroneously deprived of their children and found that risk to

–8–

be low in light of the "heightened procedural protections in termination cases." *See id.* at 353–54.

But, the supreme court also considered whether a fact-specific due process analysis controlled and conceded that "in a given parental rights termination case, a different calibration of the *Eldridge* factors could require a court of appeals to review an unpreserved complaint of error to ensure that our procedures comport with due process." *See id.* at 354. Indeed, in *B.L.D.*, the supreme court held that no such concerns were presented *in that case* where the record did not contain any evidence that appellants' counsel's error constituted ineffective assistance. *See id.* Here, I believe the facts present a different calibration where we must review whether appellants' counsel's failure to preserve *any* of the issues argued on appeal, regardless of whether appellants actually claim they received such ineffective assistance.

Accordingly, in this case and on this record, I would conclude this panel should proceed to examine whether appellants' counsel's performance was deficient and further whether such deficient performance affected the outcome of this appeal.

## II.    Right to Effective Assistance of Counsel

In parental termination cases, the parents, just as defendants in criminal cases, are entitled as to effective assistance of counsel, and we apply the standard applicable to criminal cases in parental termination cases. *See In re M.S.*, 115 S.W.3d 534, 545, 550 (Tex. 2003) (holding parents have right to effective assistance

of counsel in cases involving termination of parental rights and directing use of criminal standard) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To obtain a reversal because of ineffective assistance, appellant must show: (1) that counsel's performance was so deficient that counsel was not functioning as the counsel guaranteed by the Sixth Amendment and (2) that there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *See Sledge v. State*, 637 S.W.3d 770, 775 (Tex. App.—Dallas 2021), reh'g denied, 637 S.W.3d 967 (Tex. App.—Dallas 2022, pet. granted).

As there is no conceivable strategic rationale to justify not filing any motion or making any objection to preserve appellants' sufficiency arguments, I would conclude that appellants' counsel were constitutionally deficient and thus failed to provide assistance as guaranteed by the Sixth Amendment. *See id.* Because I have reached that conclusion regarding the first step of the *Strickland* analysis, I would also conclude that we are obliged to address the second step: whether the deficient performance of appellants' counsel affected the outcome in this appeal in order to determine whether the result of the proceeding would have been different. *See id.*

## III. Father's Appeal

In a single issue, Father challenges the sufficiency of the evidence to support the implied findings that the appointment of him as managing conservator was not in K.D.S.P.'s best interest and that appointment of Father as managing conservator

would significantly impair K.D.S.P.'s physical or emotional development in order to overcome the presumption that a fit parent acts in a child's best interest.

### A. Standards of Review and Applicable Law

The United States Supreme Court has long held that the Constitution "protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *In re C.J.C.*, 603 S.W.3d 804, 811 (Tex. 2020) (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality op.)). Texas jurisprudence underscores this fundamental right and recognizes that it gives rise to a "legal presumption" that it is in a child's best interest to be raised by his or her parents. *Id.* at 812 (citing *Taylor v. Meek*, 154 Tex. 305, 276 S.W.2d 787, 790 (1955)). Although the best interest of the child is the paramount issue in a custody determination, "[t]he presumption is that the best interest of the children" is served "by awarding them" to a parent. *Id.*

Further, five years before *Troxel*, the Texas Legislature added a statutory parental presumption applicable to original custody determinations:

> [U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

FAM. § 153.131(a). Texas courts have also recognized a presumption that parents are fit and able to make decisions regarding their children unfettered by government intrusion. *See In re C.D.C.*, No. 05-20-00983-CV, 2021 WL 346428, at *1 (Tex.

–11–

App.—Dallas Feb. 2, 2021, no pet.) (mem. op.) (citing *In re C.J.C.*, 603 S.W.3d at 814). Thus, the strong presumption that the best interest of a child is served by appointing a natural parent as managing conservator is deeply embedded in Texas law. *In re B.B.M.*, 291 S.W.3d 463, 467 (Tex. App.—Dallas 2009, pet. denied) (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990)).

To overcome this presumption, a nonparent must prove by a preponderance of the evidence that appointment of the parent as managing conservator would significantly impair the child's physical health or emotional development. *See* FAM. § 153.131(a). The evidence cannot merely raise a suspicion or speculation of possible harm. *See In re B.B.M.*, 291 S.W.3d at 467. Instead, the evidence must support the logical inference that some specific, identifiable behavior or conduct of the parent will probably harm the child. *Id.* Evidence that a nonparent would be a better custodian of the child is wholly inadequate to meet this burden. *Id.*

This is a heavy burden that is not satisfied by merely showing the nonparent would be a better choice as custodian of the child. *Id.* Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent. *Id.* at 469. A factfinder may infer the present fitness of the parent to be managing conservator from the parent's recent, deliberate past misconduct. *See In re A.V.*, No. 05-20-00966-CV, 2022 WL 2763355, at *6 (Tex. App.—Dallas July 15, 2022, no pet.) (mem. op.). But evidence of past misconduct,

–12–

standing alone, may not be sufficient to show present unfitness. *Id.* "When a nonparent and a parent are both seeking managing conservatorship, the 'close calls' go to the parent." *In re B.B.M.*, 291 S.W.3d at 469; *see also In re F.E.N.*, 579 S.W.3d 74, 77 (Tex. 2019) (per curiam) (proof of significant impairment "should include the acts or omissions of the parent demonstrating that result") (citing *Lewelling*, 796 S.W.2d at 167).

Unlike the clear and convincing standard applicable in a termination proceeding, the appointment of a nonparent as managing conservator need only be proven by a preponderance of the evidence. *See In re D.P.*, No. 05-22-00147-CV, 2022 WL 2816601, at *2 (Tex. App.—Dallas July 19, 2022, no pet.) (mem. op.). As conservatorship determinations are intensely fact driven, the trial court is in the best position to observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record. *See In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021). A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function. *See id.* The trial court's judgment will be reversed only when it appears from the record as a whole that the court has abused its discretion. *See id.* A trial court abuses its discretion when it acts without reference to any guiding rules or principles or, in other words, when it acts arbitrarily or unreasonably. *See id.*

## B. Evidence at Trial

The following was established through witness testimony and exhibits at trial.

Prior to 2017, Father lived with Stepmother and their three sons in Reynosa, Mexico. While visiting his cousin in Dallas, Father was offered a job in construction that would allow him to make far more than he was making in Reynosa. Stepmother and he discussed the opportunity and agreed he would live and work in Dallas while she and their children remained in Reynosa, and he would send money to them. According to Stepmother, it is common in Reynosa for men to work in the U.S. for extended periods of time. She testified that Father was in contact with her and her sons over audio and video calls throughout the years he lived in Dallas and that he sent money to them on a weekly basis.

While living in Dallas, Father met Mother and began a romantic relationship with her in 2018. Father moved out of the apartment he shared with roommates and into an apartment with Mother. Father candidly acknowledged that he began using illegal drugs after his coworkers encouraged him to use it as a daily stimulant. When Father and Mother became aware that Mother was pregnant with K.D.S.P., they both agreed to stop using illegal drugs. Father knew that Mother had two other children and that both were born addicted to illegal drugs. Mother went to a methadone clinic for two weeks but soon relapsed. According to both, Father and Mother each continued using illegal drugs but hid that use from each other. Mother testified that when she went to the hospital to deliver K.D.S.P., she knew her child would likely

be born addicted to heroin, but her hope was that Father would be able to take custody of their daughter. That plan did not come to pass because neither Mother nor Father passed the drug tests the Department requested they take after K.D.S.P. was born.

After the Department intervened and took custody of K.D.S.P., Father decided with Stepmother that he would return to Reynosa to enter drug rehabilitation. When questioned why he did not remain in Dallas, he answered the options he found in Dallas were much more expensive than those in Reynosa and that he was not aware the Department could help him find other options. Father proceeded to enter in-patient treatment for three months, but not before first giving the Department's contact information to Stepmother and directing her to learn how K.D.S.P. was doing. According to Father and Stepmother, his treatment took place in a locked facility he could not leave and Stepmother emailed the Department to let them know in February 2020 that Father had entered rehabilitation treatment. Stepmother also obtained from the Department the list of services Father needed to complete in order to be reunified with K.D.S.P.

Subsequent to his release from his rehabilitation treatment, Father returned to work and continued to work through the date of trial. He also contacted an office of the Department in McAllen, Texas, in order to complete the services required to be reunified with K.D.S.P. As part of that process, the Mexican equivalent of the Department, DIF, conducted home studies of Father and Stepmother's home and

–15–

interviews of Father, Stepmother, and their three sons. Father participated in drug testing, as did Stepmother and their three sons. Father admitted he tested positive for drugs in January 2021, but he explained that the positive test was from a medication he obtained in Mexico to treat his toothache.

Around the same time that Father was released from rehabilitation treatment, returned to work full-time, and began completing services with the Department and DIF, Father began visiting K.D.S.P. remotely with video calls, each lasting about an hour long, in June of 2020. He testified he could not visit with her in person at that time because of the ongoing pandemic. Foster Mother facilitated those calls, keeping the infant K.D.S.P. engaged. According to her, Father would ask for pictures whenever he had a video call with his daughter. She testified that Father was kind, thankful, attentive, and "basically a good person to deal with." The CASA advocate also testified positively as to Father's interactions with K.D.S.P.

Father testified his job at the time of trial was a truck driver, a job that required him to work and be away from home six days a week. He testified his plan was for Stepmother and his mother to be at home with K.D.S.P. He and Stepmother had a crib set up in their room and were in the process of building an additional room onto their house for K.D.S.P. to have her own room. His oldest son had his own room, while the two younger sons shared a room. Among Father's exhibits at trial was the home study prepared by DIF, which included statements from his sons looking forward to having their sister live with them. Father also provided pictures from his

visits with K.D.S.P. in person. He testified that at the visit that took place one evening during trial, he, Stepmother, and one of their sons were present, while the other two sons were able to join remotely. Other pictures depicted Father's visit from the previous December with his daughter, as well as his house and his family on vacation in 2022.

Stepmother testified she would care for K.D.S.P. and offer her the same love and support she had raised her three sons with. According to Stepmother, she had forgiven Father for his relationship with Mother and believed he would continue to abstain from using illegal substances. When asked why she wanted to "taken in a child that's not your own," she responded that K.D.S.P. is her children's blood and that children should be with their parents. She professed to accept and love K.D.S.P. with all her heart and want the best for her. To Stepmother, K.D.S.P. is no different than her own children. Although she was working at the time of trial, Stepmother planned to cease working to care for K.D.S.P. at home as she had her sons. Stepmother testified she enjoyed meeting and visiting with K.D.S.P. She also testified that Father is and has been a good dad and that he is engaged with their sons, helping them with their homework and taking them to play in the park.

The Program Director for the Department testified as a witness for Foster Parents. According to Program Director, she is in charge of Region 3, which encompasses Dallas, while Father has been working with employees of the Department in Region 11 where he works. When asked about potentially placing

–17–

K.D.S.P. with Father, the Program Director testified as to concerns with the initial report from Father's home study, particularly that she did not believe the Department had received answers to its questions, Father "needed more people to be of support," and more drug testing. She testified that it was concerning that she did not know anything of Father's life in Mexico and that she considered the following indications he would not be able to parent K.D.S.P. safely: Father travels between Mexico and the U.S. for work; Stepmother would be the primary caregiver; K.D.S.P. was born as a result of an extramarital affair; K.D.S.P.'s young age would prevent her from being able to protect herself against any potential backlash from Stepmother; and the Department is not able "to monitor the interaction between them all."

The Program Director admitted she had not spoken with the personnel in Region 11, although she averred she had made attempts to do so, and she also admitted she had not seen the completed and translated home study—"I really don't recall it being this thick or this detailed"—which was offered and admitted as an exhibit at trial. She further admitted that she had spoken to Stepmother and that nothing was said to trigger any concern that Stepmother would mistreat K.D.S.P. Moreover, she testified that requesting a home study on a child's parent was "very rare" and that the reason the Department requested additional information after the initial home study report was "it's out of the country, so it's different." She also testified her main concerns were that the Department could not monitor the case because Father lives in a different country and that no support system, such as

nonrelated references, had been established in the home study report to insure Father's sobriety and the child's care.

In response to the concerns raised about monitoring the child if she were placed in Father's home, Father called a witness from the Mexican consulate ("Consul"), who described himself as "in charge of matters or minors underage in Mexico, for Mexico." The Consul testified he had worked on this particular case; DIF conducted a home study on Father's home; at the request of the Department or as ordered by a judge, DIF has the ability to provide supervision of the child at her Father's home in Mexico; and that it was in K.D.S.P.'s best interest "to go to Mexico."

In addition to the evidence regarding Mother and Father, there was also testimony from and other evidence regarding Foster Parents.

The Program Director testified that in order to become foster parents, individuals must obtain a license, complete a certain amount of trainings every year, maintain daily documentation for the youth they care for, and submit to periodic unannounced visits from child placing agency case managers, CASA advocates, and guardians ad litem. When questioned what placement would be in the child's best interest, the Program Director testified it would be to stay with Foster Parents because they have given her good care and because they have received a lot of training.

Foster Mother testified she had been married to Foster Father for twenty years and that they had two children, a son in college and a daughter in high school. Both Foster Parents were born in Mexico and later moved to the U.S. and became U.S. citizens. Foster Mother worked from home taking customer service phone calls for a company that owns a series of nursing homes. Foster Father worked in a company he started in 2020 installing elevators. Before then, Foster Father bought, remodeled, and sold houses. According to Foster Father, he is an active father, prioritizing being with his family on weekends and supporting his children's activities in theater and soccer. Foster Mother and Foster Father obtained a license to foster children in 2011 and since then have fostered approximately a dozen children. They made the decision to foster children because they "wanted to help kids that . . . were in the system, that needed a mom and a dad, that spoke our language, that spoke Spanish." According to Foster Mother, they receive some daily payment per night each child is fostered with them, but they are not financially motivated to foster.

According to Foster Mother, K.D.S.P. was a little over one month old when she came to live at her house. Foster Mother took her to regular and specialist doctors for regular well check-ups as well as for treatment of K.D.S.P.'s low birth weight, oversized head, and heart murmur, all of which had been resolved by the time of trial. Because Foster Mother worked from home, K.D.S.P. attended a daycare. Both Foster Mother and Foster Father are bilingual in Spanish and English

–20–

and speak mostly English at home, although K.D.S.P. knew some Spanish words. At K.D.S.P.'s daycare, English was spoken. After daycare, K.D.S.P. typically has dinner with the foster family and goes with Foster Parents to soccer practices. On weekends, K.D.S.P. typically goes with her foster family to visit their relatives or to soccer games. Foster Father's parents lived near Foster Parents, and they visited with K.D.S.P. at least three times a month.

When K.D.S.P. was about six months old, Foster Mother began facilitating video calls between K.D.S.P. and Father. Because the Department's caseworker did not speak Spanish but was on the calls, Foster Mother often translated questions Father had about the ongoing case. For the first month or so, Foster Mother would place the child in her high chair with the phone in front of her and some toys, as well as keep the other members of her family out of the room. After K.D.S.P. grew older and frustrated with spending the calls in her highchair, Foster Mother moved the child to the living room and followed her with the phone to continue the video call with Father.

According to Foster Mother, she and Foster Father decided to intervene in the case because of the length of the case and the growing attachment between the members of the foster family and K.D.S.P. Foster Parents loved K.D.S.P. as their own daughter. Foster Mother testified their family loved K.D.S.P. She offered into evidence pictures of the child alone and with members of the foster family at Foster Mother's home, at her sister's home, and on a trip to New York to visit her son at

college. Foster Father testified his goal in pursuing termination of Mother's and Father's rights was to pursue adoption of K.D.S.P. in order to establish her home permanently with the only family she has known.

Foster Mother testified about her fears for K.D.S.P. should she be returned to Father. She was concerned the child would not know anyone, that her world would change, and that she would not know the language spoken in Father's home. She also admitted that K.D.S.P. had had to adapt to changing environments in her brief life, including staying home from daycare during the pandemic and changing to different daycares. But Foster Mother opined that K.D.S.P. would be traumatized by the experience of leaving her home with the foster family and living in Father's home. She admitted that earlier in the case, she recommended returning K.D.S.P. to Father, but because of the length of time and K.D.S.P.'s age and the growing attachment among the members of the foster family and K.D.S.P., she changed her mind and sought termination of Mother's and Father's parental rights and alternatively managing conservatorship of K.D.S.P.

Foster Parents called two friends as witnesses to testify as to their good character. Both had known Foster Parents for years and testified as their excellent care of K.D.S.P. Both also testified as to having no concerns regarding Foster Parents' care of K.D.S.P. and that they treated her as they did their own biological children.

The Court Appointed Special Advocate (CASA) testified she had visited with K.D.S.P. monthly in person and virtually throughout the case, beginning in January of 2020. She prepared summary reports prepared before hearings in the case, which included brief histories of the case, recent information regarding visits, and placement recommendations from CASA. In her reports dating from February 2020 through May 2021, CASA recommended K.D.S.P. remain with Foster Parents. She included notes on the care Foster Parents gave the child, as well as Father's consistent visits with K.D.S.P., his completion of various classes and trainings, and his repeated statements that he wanted his daughter to be reunified with him. She also noted Father's one positive drug test result in March 2021. But in her September 2021 report, CASA recommended that due to Father's "completion of services, visiting consistently with child, [and] upon recommendation of his counselor, he should be reunited with [K.D.S.P.]." In her final report in December 2021, she recommended K.D.S.P. remain with Foster Parents and that Father provide the Department with contact information for his mother and niece in order for background checks on them.

According to the CASA, this case represented a close call for her in terms of what to recommend for K.D.S.P.'s placement. She had observed the care the Foster Parents had provided the child, calling them a wonderful family and stating they had bonded with K.D.S.P., had done "an excellent job" caring for her, and "have done everything." But, she also testified she had observed Father communicated and

consistently visited with his daughter and had also "done everything that's asked of him." Her recommendation was that Father should not be denied his child. She also testified that she thought it would be "a positive thing in her life" for K.D.S.P. to maintain contacts with her foster family. Her proposed "best of both worlds" would be for K.D.S.P. to be placed with Father and Foster Parents allowed to continue a relationship with her.

### C.     Jury's Charge and Findings[5]

The jury's charge asked whether the jury found by clear and convincing evidence that Father knowingly placed or knowingly allowed K.D.S.P. to remain in conditions or surroundings that endangered her physical or emotional well-being. The jury's charge also asked whether the jury found by clear and convincing evidence that Father engaged in conduct or knowingly placed K.D.S.P. with persons who engaged in conduct that endangered her physical or emotional well-being. The jury answered yes to these two questions, but they answered no to the question asking whether they found by clear and convincing evidence that termination of Father's relationship with K.D.S.P. would be in the child's best interest.

Because the jury did not find termination of Father's rights was in K.D.S.P.'s best interest, they were next asked to determine who should be named as her managing conservator. As part of that question, the jury was instructed that, in

---

[5] The first four questions asked the jury to make findings regarding Mother, which need not be addressed in this section addressing Father's appeal.

accordance with section 153.131, a parent shall be appointed managing conservator of the child "unless it is shown by a preponderance of the evidence that appointment of a parent as Managing Conservator would not be in the best interest of the child . . . because the appointment would significantly impair the child's physical health or emotional development." *See* FAM. § 153.131(a). The jury was further instructed that if a nonparent were appointed as managing conservator, the parent would be appointed as possessory conservator. No one objected to these instructions; accordingly, I would review the evidence in light of these instructions. *See Danet v. Bhan*, 436 S.W.3d 793, 796 (Tex. 2014).

> ### D. *Insufficient Evidence Supports the Jury's Implied Finding that Appointment of Father as Managing Conservator Would Significantly Impair K.D.S.P.'s Physical Health or Emotional Development*

Father argues the evidence in the record fails to establish the parental presumption was rebutted. He points to the evidence that he successfully completed services in Mexico and in McAllen, has a suitable home for K.D.S.P., has consistently visited with her with weekly video calls, is employed, and has a stable home and extended family.

To be sure, the evidence shows that Father engaged in past conduct that might significantly impair K.D.S.P.'s physical or emotional well-being. Father used illegal substances prior to these proceedings and his submission to services and home

–25–

studies. And when K.D.S.P. was born, he left her in the custody of the Department for several months.[6]

However, Father left K.D.S.P. with a government agency, knowing that he could not take custody of her himself and knowing that Mother similarly could not do so. He left in order to receive several months of treatment in order to become the parent K.D.S.P. needed him to be. Father conceded his relationship with Mother and his drug use to his wife, Stepmother, and asked her to check on his infant daughter while he was in treatment. When he was released from treatment, he found employment, worked with the Department and DIF to complete further services, and he began regular, consistent visits with K.D.S.P. He tested positive once during the case for drugs. He provided an explanation for that positive test, and he completed additional counseling and treatment. *See, e.g.*, *C. O. v. Tex. Dep't of Family & Protective Servs.*, No. 03-21-00453-CV, 2022 WL 413374, at *8 (Tex. App.—Austin Feb. 11, 2022, no pet.) (mem. op.) (concluding evidence of parent's sole

---

[6] I note that the jury found by clear and convincing evidence that Father had:

> knowingly placed or knowingly allowed K.D.S.P. to remain in conditions or surroundings that endanger the physical or emotional well-being of the children [FAM. § 161.001(b)(1)(D)] and
>
> engaged in conduct or knowingly placed K.D.S.P. with persons who engaged in conduct that endangers the physical and emotional well-being of the child [FAM. § 161.001(b)(1)(E)].

Although Father did not specifically challenge the jury's findings regarding endangerment, I would conclude they are necessarily subsumed in his challenge to the lack of evidence regarding significant impairment because we have previously held that "[c]ertain past acts or omissions such as physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior may indicate a threat of future harm to a child." *See In re B.B.M.*, 291 S.W.3d 463, 469 (Tex. App.—Dallas 2009); *cf. In re M.G.*, No. 12-16-00312-CV, 2017 WL 2299168, at *2 (Tex. App.—Tyler May 26, 2017, no pet.) (mem. op.) (Father waived challenged grounds of termination by endangerment and failure to comply with court-ordered service plan by failing to challenge ground of knowingly engagement in criminal conduct).

positive drug test and failure to obtain protective order against abusive romantic partner, most of which occurred eighteen to twenty-six months before conclusion of final hearing was factually insufficient to support significant-impairment finding); *In re J.A.*, No. 05-19-01333-CV, 2020 WL 2029248, at \*5, 8 (Tex. App.—Dallas Apr. 28, 2020, pet. denied) (mem. op.) (parent's use of marijuana three times during pendency of case legally insufficient to support finding termination of his parental rights in child's best interest).

Thus, although there is some evidence that Father's past conduct indicated risks to the child's physical or emotional well-being, the evidence of his recent conduct, particularly after his cooperation with the Department and DIF, does not indicate any threat of future harm to this child. *See In re A.V.*, No. 05-20-00966-CV, 2022 WL 2763355, at \*6 (Tex. App.—Dallas July 15, 2022, no pet.) (mem. op.); *Critz v. Critz*, 297 S.W.3d 464, 475 (Tex. App.—Fort Worth 2009, no pet.) ("If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling."); *see also In re B.B.M.*, 291 S.W.3d 463, 469 (Tex. App.—Dallas 2009) (noting custodial matters are inherently fact intensive must be reviewed on an individualized basis).

Other than Father's past conduct, the concerns raised by the evidence at trial are more theoretical and speculative, which is not sufficient to support a finding of significant impairment so as to overcome that constitutional and statutory paradigm

that is an unfit parent or that appointing him managing conservator would result in significant impairment. *See in re A.V.*, 2022 WL 2763355, at *6. For example, the Program Director expressed concerns about K.D.S.P. living in another country where the Department could not monitor her.[7] Even if such a concern were relevant to this finding, the evidence showed the DIF more than capable of coordinating with the Department regarding any services, home visits, or other interventions. The Program Director also expressed concern about what potential negative consequences might be experienced by K.D.S.P. because she was born as a result of an extramarital affair and Father's plan was for Stepmother to be his daughter's primary caregiver while he traveled for most of the week for his job. The Program Director admitted these concerns were not based on anything Stepmother had said or any evidence other than her own fears. Moreover, Stepmother testified she loved K.D.S.P. as the sister of her sons and the daughter of her husband. And she spoke in glowing terms of the child when recounting the in-person visit between K.D.S.P. and Father, Stepmother, and one of their sons. Thus, any concern related to the circumstances of the child's birth was speculative and unfounded.

The other concern raised by more than one witness at trial was what effect separating K.D.S.P. from Foster Parents would have on her. We do not treat this

---

[7] I do not doubt the Department's commitment to the best interests of K.D.S.P. and all children. However, having declined to pursue termination of Father in this case, and having coordinated oversight of him with their counterpart in Mexico, I presume it would not suggest that either the country of Mexico or its nationals are inherently less interested or able to rear or oversee the basic welfare needs of their children.

concern lightly as the evidence establishes that at the time of trial, K.D.S.P. had spent nearly her entire life with Foster Parents and had become bonded with them and their extended family. Foster Mother expressed particular concern that the child would have a difficult time understanding and adjusting to a new home with a new family in a new country where a different language was spoken. Father, too, conceded, that "in the beginning, it will be" that K.D.S.P.'s primary caregiver, Stepmother, will be "a total stranger" to the child.

But, as previously stated, to support a finding of significant impairment, the evidence must do more than merely raise a suspicion or speculation of possible harm. *See In re B.B.M.*, 291 S.W.3d at 467. Likewise, the controlling constitutional question here is not whether the jury or the court believe the Foster Parents (or the United States) would provide a better home. *See id.*; *In re B.A.B.*, No. 07-21-00259-CV, 2022 WL 1687122, at *5 (Tex. App.—Amarillo May 26, 2022, no pet.) (mem. op.); *see also Troxel*, 530 U.S. at 72–73. Instead, the evidence must support the logical inference that some specific, identifiable behavior or conduct of the parents, demonstrated by specific acts or omissions, will probably harm the child. *See In re B.B.M.*, 291 S.W.3d at 467. Further, we have previously declined to adopt a holding that the negative effect on the child caused by her separation from the nonparents may, standing alone, be sufficient to deny a natural parent managing conservatorship. *See id.* at 468. A mere potential threat, as opposed to evidence of

–29–

actual harm to the child's emotional development, is insufficient to deny a natural parent the right to raise his or her own child. *See id.*

Much as I commend the Foster Parents for their care and nurturing of K.D.S.P., I would conclude the evidence is insufficient to rebut the parental presumption. Thus, I would conclude that on this record on appeal, but for the deficient performance of Father's counsel, the result of this appeal would have been different, *i.e.*, to sustain Father's issue and conclude Father should have been appointed managing conservator of K.D.S.P. *See Sledge v. State*, 637 S.W.3d 770, 775 (Tex. App.—Dallas 2021), reh'g denied, 637 S.W.3d 967 (Tex. App.—Dallas 2022, pet. granted).

## IV. Mother's Appeal

In three issues, Mother challenges the legal and factual sufficiency of the evidence to support the jury's finding that termination of her parental rights was in the best interest of K.D.S.P. The standards of review and applicable law in a parental termination case and more particularly a challenge to a best-interest finding therein are well known and are not improved upon by repetition in this dissent. Suffice it to say that I would hold that the evidence presented at trial is legally and factually sufficient to reasonably establish a firm belief or conviction that termination of Mother's parental rights is in K.D.S.P.'s best interest. *See* FAM. § 106.001(2); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Accordingly, I would conclude that in Mother's case, the second *Strickland* step has not been met such

that but for her counsel's deficient performance the outcome in these proceedings would have been different. *See Sledge*, 637 S.W.3d at 775

## V.   I Would Resolve This Appeal in Father's Favor and Remand for Consideration of Foster Parents' Right to Possessory Conservatorship

As stated above, I would conclude that the result of this appeal would have been different but for Father's counsel's deficient performance. Generally, when we sustain a complaint regarding effective assistance of counsel, we reverse the trial court's judgment and remand for new counsel. *See In re M.S.*, 115 S.W.3d 534, 550 (Tex. 2003). Here, however, Father's sufficiency complaint presents a question of law where no evidence supports the jury's implied finding of significant impairment and appointment of Foster Parents as managing conservators. Thus, I would conclude that we must render the judgment the trial court should have rendered. *See* TEX. R. APP. P. 43.3; *cf. In re A.F.*, No. 05-17-00392-CV, 2017 WL 4116945, at *7 (Tex. App—Dallas Sept. 18, 2017, no pet.) (mem. op.) (concluding remand appropriate where "the adversarial process employed in this case was so unreliable" that appellants' case had not been fully developed). Accordingly, I would, in addition to affirming the portion of the trial court's judgment terminating Mother's parental rights, reverse the remainder of the trial court's judgment and render judgment that Father be appointed managing conservator of K.D.S.P.

Having concluded that the termination of Mother's parental rights to K.D.S.P. should be affirmed and that Father should be appointed sole managing conservator

of K.D.S.P., I would also consider what possession or access, if any, Foster Parents might be left with. In their petition to intervene in this case, Foster Parents sought to be appointed joint managing conservators of K.D.S.P. pursuant to both Chapter 153 Subchapter G and Section 153.131 of the family code. As discussed above in my proposed disposition of Father's issues, section 153.131 relates to the presumption in favor of appointment of a parent or parents as managing conservators of a child. Chapter 153 Subchapter G provides for the appointment of nonparents as conservators, both as managing conservator, *see* FAM. § 153.371–72, and as possessory conservator, *see* FAM. § 153.376. Unlike the appointment of a managing conservator, the appointment of a nonparent as a possessory conservator does not require evidence of significant impairment of K.D.S.P.'s physical health or emotional well-being. *Compare* FAM. §§ 153.131, 153.372(b) *with* FAM. § 153.376. Thus, my proposed conclusion regarding the lack of such evidence would not bar Foster Parents' appointment as possessory conservators of K.D.S.P.

In light of the evidence that Foster Parents provided K.D.S.P. with all the love and care anyone could wish for a child for over two years from her infancy through trial, and in light of the fact that Foster Parents' petition sought conservatorship over K.D.S.P. through a statute that provides for both managing and possessory conservatorship,[8] I would conclude the interest of justice requires remand to the trial

---

[8] *See, e.g.*, *In re J.A.J.*, 243 S.W.3d 611, 615 (Tex. 2007) (holding that because Department sought appointment as child's conservator on multiple grounds, when one ground overturned on appeal, remaining unchallenged ground could support that appointment).

court for consideration of whether Foster Parents should be appointed possessory conservators of K.D.S.P. *See In re H.H.*, No. 05-15-01322-CV, 2016 WL 556131, at *4 (Tex. App.—Dallas Feb. 12, 2016, no pet.) (mem. op.) ("Appellate courts have broad discretion to remand a case for a new trial in the interest of justice.").

## CONCLUSION

I would conclude that, at least in the instance of Father's appeal, but for the deficient performance of appointed counsel, the result on appeal would have been contrary to the judgment entered against him on the issue of conservatorship, as there is no evidence to support the implied finding that appointment of him as managing conservator would significantly impair K.D.S.P.'s physical health or emotional development. I would thus affirm the portion of the trial court's order terminating the parental rights of Mother as to K.D.S.P., reverse the remainder of the trial court's order, render judgment that Father be appointed sole managing conservator of K.D.S.P., and remand the case to the trial court for further consideration of whether Foster Parents be granted possessory conservatorship of K.D.S.P.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

220456DF.P05

–33–